UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.                                                    Civil No. 08-817 (JNE/SRN)
                                                      ORDER
Kathryn Bigalk, Kim Bigalk, Todd
Bigalk, Terry Bigalk, Arnold Bigalk,
the Personal Representative of the
Estate of Kenneth Bigalk, the Trustee
for the K & K Limited Trust,
Crosby & Associates, Robert Manseau,
Jean Manseau, Marvin Pullman, Lorraine
Pullman, and the Estate of Winfield Bender,

      Defendants.

---

Michael R. Pahl, Esq., U.S. Department of Justice, appeared on brief for Plaintiff United States
of America.

Lawrence H. Crosby, Esq., Crosby & Associates, appeared on brief for Defendants Kathryn
Bigalk, Kim Bigalk, Todd Bigalk, Terry Bigalk, Arnold Bigalk, the Personal Representative of
the Estate of Kenneth Bigalk, K & K Limited Trust, and Crosby & Associates.

Defendants Robert Manseau, Jean Manseau, Marvin Pullman, Lorraine Pullman, and the Estate
of Winfield Bender did not appear.

---

      The United States of America brought suit against Kathryn Bigalk, Kim Bigalk, Todd

Bigalk, Terry Bigalk, Arnold Bigalk, the personal representative of the estate of Kenneth Bigalk,

the trustee for K & K Limited Trust (K & K), Crosby & Associates, Robert Manseau, Jean

Manseau, Marvin Pullman, Lorraine Pullman, and the estate of Winfield Bender to foreclose on

federal tax liens encumbering real property in Fillmore County, Minnesota.  The government

seeks a decree that Kenneth and Kathryn Bigalk, a married couple, fraudulently conveyed the

real property (Bigalk farm) to K & K and/or that K & K holds the Bigalk farm as their alter ego

or nominee; to reduce federal tax assessments against Kenneth's estate to judgment; and to foreclose on federal tax liens encumbering the Bigalk farm. The case is before the Court on the government's motion for partial summary judgment seeking a declaration that the transfer of the Bigalk farm to K & K was a fraudulent conveyance under the Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41-.51 (2008), and a determination that K & K is the alter ego or nominee of Kenneth and Kathryn Bigalk under Minnesota law. Kathryn Bigalk, Kim Bigalk, Todd Bigalk, Terry Bigalk, Arnold Bigalk, the personal representative of the estate of Kenneth Bigalk, K & K, and Crosby & Associates (Responding Defendants) responded to the motion. For the reasons set forth below, the Court grants the motion.

## I.    BACKGROUND

### A.    Chronology

Kenneth and Kathryn married in 1956.[1] They operated the Bigalk farm and lived in a house located on the property, where they raised their daughter, Kim, and two sons, Terry and Todd. Kathryn, Terry, and Todd all testified during their depositions that Kenneth did not believe that he had to pay taxes. Kathryn could not recall when Kenneth's involvement with people who believed they did not have to pay taxes began, but Terry testified that Kenneth became involved in anti-tax activities "later on in the 80s." Kim testified that Kenneth became involved with tax protestor activities in the 1980s because "[t]hings were tough" for farmers. Kenneth's involvement with the tax protestor movement included participating in meetings attended by other people who believed they did not have to pay taxes. According to Todd, Kenneth's cousin Milton Bigalk hosted the meetings.

---

[1]      This case involves several persons having the last name of Bigalk. The Court refers to the Bigalks by their first names when distinguishing between them.

On March 4, 1991, Kenneth and Kathryn signed their federal income tax return for 1990, claiming they were entitled to a refund of $178. That same day, Kenneth and Kathryn established K & K. According to Kathryn, Kenneth got the idea to set up a trust from Marvin Pullman, who also was involved in anti-tax activities. The settlor of K & K was Cache Properties Unlimited and the first trustee was Alex Yung. Yung was later convicted on charges of conspiracy to defraud the United States for selling trusts marketed as a device to eliminate income tax liability, some of which listed Cache Properties Unlimited as their grantor and Yung as the first trustee. *See United States v. Scott*, 37 F.3d 1564, 1569-70 (10th Cir. 1994); *see also United States v. Engels*, No. 98-2096, 2001 WL 1346652 (N.D. Iowa Sept. 24, 2001) (finding Cache Properties trusts to be alter egos for federal tax purposes). Although Kathryn stated in Answers to Interrogatories that K & K was created to avoid probate expenses and pass the Bigalk farm and equipment to their children, Kathryn testified that K & K was set up to protect the Bigalk farm because she thought "if you have a trust, you don't have to pay taxes." According to a May 13, 1992, letter from the U.S. Department of Agriculture (USDA), Kenneth and Kathryn each held a 50% interest in K & K.

On August 13, 1991, Kenneth and Kathryn transferred the Bigalk farm to K & K, and subsequently transferred the farm equipment. The Responding Defendants maintain that Kenneth and Kathryn received "Capital Share Units" in K & K in exchange for the Bigalk farm, but they admit in their Answers to Interrogatories that K & K "paid no consideration for the transfer of the real property." The recorded deeds indicate that Kenneth and Kathryn received no consideration for the Bigalk farm. Kim testified that Kenneth put the Bigalk farm into K & K because he hoped it would "keep their heads above water." Terry testified that Kenneth put the Bigalk farm into K & K "so the IRS couldn't get it." On January 30, 1993, Kenneth and Kathryn

executed deeds stating that they, as trustees of K & K, were transferring the Bigalk farm to themselves as trustees for consideration of "$500 or less."

Kenneth and Kathryn did not timely file their federal tax returns for 1991 to 1993.[2]  In August 1993, the Internal Revenue Service (IRS) audited Kenneth and Kathryn's 1990 tax return and requested documents to substantiate claimed income and business expenses.  In response, Kenneth and Kathryn sent letters, affidavits, "constructive notices," and "notices of defaults" between August 1993 and April 1995 in which they maintained that the audit violated state and federal law, that the IRS had no authority to serve summonses on financial institutions, that the federal income tax is a voluntary tax, that they were not taxpayers, and that they did not have to provide the requested documents.  They also demanded the return of all federal income tax they had paid in the past.  A Certificate of Assessments, Payments, and Other Specified Matters submitted by the government indicates that in July 1994, the IRS assessed additional tax, interest, and penalties in the amount of $195,426 against Kenneth and Kathryn for 1990.  The IRS also conducted an audit for 1991 to 1993.  The Certificates of Assessments, Payments, and Other Specified Matters for those years indicate that the IRS prepared substitute returns for Kenneth and Kathryn for 1991 to 1993 and, on May 2, 1996, assessed tax, interest, and penalties of $321,531 for 1991, $282,873 for 1992, and $321,735 for 1993 against them.

On May 17, 1995, after receiving a lien notice from the IRS, Kenneth submitted a false money order for $390,854 to the IRS, purportedly in payment of his 1990 tax liability.[3]  In that submission, Kenneth requested a refund because the false money order was for more than the tax

---

[2]     It appears that in 1995, Agmaster-Iowa Farm Bureau Management prepared federal tax returns on behalf of Kenneth and Kathryn for 1991 to 1993.  It is unclear from the record when, if ever, those returns were filed with the IRS.

[3]     The IRS later released the 1990 federal tax lien.

owed.  In September 1997, Kenneth was indicted and charged with various felonies related to his

tax protestor activities.  Marvin Pullman and Milton were co-defendants in the case.  On March

12, 1998, Kenneth pleaded guilty to conspiracy to defraud the United States.  In Kenneth's plea

agreement, he admitted that he had obtained the false money order from Milton; that he had

submitted the false money order and requested a refund knowing that the money order was false;

that he and Milton had transferred funds owned by Kenneth to Antigua, which has no reciprocal

tax/income agreements with the United States; and that between February and June 1996, he had

served on the IRS "Non-Statutory Abatements" prepared by the Fillmore County "common law

court," which demanded that the IRS cease and desist all collection activities against Kenneth or

face severe criminal and civil penalties.  Marvin Pullman and Milton went to trial and were

convicted of conspiring to defraud the United States, aiding and abetting the use of counterfeit

securities, and obstructing and impeding the IRS.  Kenneth was sentenced to four months'

imprisonment in the Fillmore County jail, but was permitted to work the Bigalk farm on work

release during that time.  According to Kathryn, Kenneth destroyed all of their business records

at the conclusion of the criminal case on the recommendation of Special Agent Tschida from the

IRS.

Approximately seven years ago, Kenneth and Kathryn moved from the Bigalk farm to

Harmony, Minnesota.  Todd took over operation of the Bigalk farm and moved into the house

located on the property.  Kenneth died in 2006.

**B.**      **Operation of K & K**

The Responding Defendants' Answers to Interrogatories state that Kim, Terry, Todd,

Kenneth's brother Arnold Bigalk, Bruce Popken, and Lorraine Pullman served as trustees of

K & K.  Kathryn testified that Popken was Kenneth's friend, and Kim testified that Lorraine

Pullman was a friend of Kenneth and Kathryn's. The Answers to Interrogatories also state that Kenneth, Kathryn, Kim, and Todd served as managers of K & K. During their depositions, however, Kathryn, Kim, Terry, and Todd appeared confused about their respective roles and the roles of other family members. According to Kathryn, she served as the secretary of K & K at one time, although she did not remember ever taking meeting minutes. Kathryn testified that Todd was an assistant manager and Kim was the manager, but could not say what, if anything, they did in those roles. Todd testified that Marvin Pullman was the secretary of K & K and drafted the meeting minutes. Todd also testified that Terry, Kim, and Popken were trustees and that Kim was the assistant manager of K & K. Todd did not know what Kim did in her managerial role. Todd thought that he was "either the assistant manager or general manager or whatever," but did not know which position he actually held. Terry thought he had been a trustee and did not know if he had ever served as a manager of K & K. He thought that Todd was the manager of K & K, but did not think Kim had ever managed the trust. Kim testified that she was the treasurer and a general manager for K & K. She did not know if she had ever served as a managing trustee.

Although Terry, Todd, and Kim were named as trustees and officers of K & K, they were not actively engaged in the management of the trust. Terry testified that only Kenneth and Marvin Pullman understood how K & K worked. He did not know if he would ever inherit the Bigalk farm. Terry did not know what a capital unit holder was, could not identify the grantor or settlor of K & K, and did not know that he was a beneficiary of K & K until he was shown a document indicating as much on the day of his deposition. Terry testified that he signed trust meeting minutes without attending the meetings because Kenneth told him to do so and admitted that he signed K & K documents without reading them when Kenneth asked for his signature.

When shown a document stating that Terry had met with people concerning a loan for K & K, Terry had no recollection of the meeting. According to Terry, when Todd began operating the farm seven years ago, Kenneth, not K & K, chose Todd to operate the farm and decided that Todd could start living in the house on the property.

Kim testified that Kenneth took care of the business and that she did not do anything as a member of the board of K & K other than sign documents at Kenneth's request. According to Kim, she became the general manager because Kenneth asked her to fill the role. Kim became the treasurer because they "needed a name." She did not do any bookkeeping for K & K, was not in possession of the K & K checkbook, only "vaguely" remembered signing checks for the trust, and did "nothing" as the general manager. At her deposition, when shown a document purportedly signed by Kim in her role as the manager of K & K and notarized by Lorraine Pullman, Kim denied that the signature was hers.

Todd testified that he did not understand trusts. He did not know if he had any ownership interest in K & K, what Terry and Popken did as trustees of K & K other than show up at meetings, or what Kim did as a trustee or manager. Kathryn testified that she did not understand K & K and did not know what a capital unit of the trust was. She did not think she had any capital units, and did not know what happened to Kenneth's interest in K & K when he passed away.

With respect to trust meetings, Kathryn could only remember one meeting that took place before she and Kenneth moved to Harmony. The only meeting Terry could remember occurred in Harmony after Kenneth died in 2006, and he didn't "know if [he] would call it a trust meeting." Todd testified that annual trust meetings were held at Kathryn's house in Harmony and thought that one other trust meeting took place at the house on the farm. Todd, however,

could not give any examples of business discussed at the meetings. Kim testified that she attended "a few" meetings which were attended by board members, but could not remember which board members attended, how many meetings she attended, when or where the meetings occurred, or what was discussed at those meetings.

Kathryn, Terry, and Kim testified that the transfer of the Bigalk farm to K & K did not change how Kenneth operated the farm. Kenneth and Kathryn received a draw from K & K, but did not pay rent to live in the house. Todd currently does not pay rent to live in the house. Kathryn testified that K & K placed no restrictions on how she and Kenneth used the Bigalk farm or the house. Terry testified that he never put any restrictions as a trustee on Kenneth's use of the Bigalk farm and that decisions about running the farm were "not [his] call." Kathryn testified that Kenneth, Popken, and another friend of Kenneth's had signatory authority for the K & K checking account. According to Kathryn, there were no restrictions on Kenneth's use of the K & K checkbook, which was kept in their house, and he could write a check for any reason at any time. The insurance on the Bigalk farm remained in the names of Kenneth and Kathryn. K & K paid for Kenneth's life insurance policy and Todd's rent. In 1998, Kenneth and Kathryn listed the Bigalk farm as a personal asset when filing for bankruptcy.

## C.    Fillmore County Probate Court Proceedings

Kenneth died intestate in February 2006. In April 2008, two months after commencing this action, the government filed a Petition for Formal Adjudication of Intestacy, Determination of Heirs, and Appointment of Personal Representative in Fillmore County Probate Court. The government then moved for the appointment of a personal representative of the estate. Counsel in the probate court case are the same as counsel in this case. In an order dated December 1, 2008, the probate court "temporarily denied" the motion because there was "not currently an

estate to probate." In so ordering, the court found that, based on the parties' testimony, it appeared that Kenneth had left all of his assets in a trust and that no assets remained in his estate. The probate court further found that the validity of the trust was not before it because the "U.S. District Tax Court in St. Paul, Minnesota" had asserted jurisdiction over the validity of the trust.[4] The probate court explicitly found that the only issue before it was whether a personal representative should be appointed. Finally, the findings of fact indicate that the defendants in the probate case asserted that other lawsuits were pending involving the same parties and that "this matter" should be handled in one of those cases.[5]

## II. DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[4]     The United States Tax Court docket indicates that Case No. 013781-07 against Kathryn is pending and scheduled for trial on September 14, 2009.

[5]     It is unclear from the December 1 Order whether "this matter" refers to the appointment of a personal representative or the validity of K & K.

**A.    Subject Matter Jurisdiction**

Contending that the government sought and was denied a determination from the probate court that Kenneth's estate held enough property to be probated, the Responding Defendants assert that the Court lacks subject matter jurisdiction over this case under the *Rooker-Feldman* doctrine.  The government responds that the probate court made no such determination and that the *Rooker-Feldman* doctrine does not bar this suit.  The *Rooker-Feldman* doctrine "is applied to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'"  *MSK EyEs Ltd. v. Wells Fargo Bank, Nat'l Ass'n*, 546 F.3d 533, 539 (8th Cir. 2008) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

The probate court's December 1 Order recognized that the validity of K & K was not before it and temporarily denied the government's motion to appoint a personal representative pending a determination of whether there is an estate to probate.  The government's request for a declaration from this Court that the Bigalk farm was fraudulently conveyed to K & K or that K & K holds the Bigalk farm as the alter ego or nominee of Kenneth and Kathryn is not a request for "review and rejection" of the probate court's temporary denial of the government's motion. Rather, the government seeks a determination from this Court that would permit the probate court to determine whether there is an estate to probate and therefore whether the probate court should appoint a personal representative.  Consequently, the *Rooker-Feldman* doctrine does not divest this Court of subject matter jurisdiction over this case.

**B.    Statute of Limitations**

The Responding Defendants contend that state statutes of limitations bar the government's fraudulent conveyance claim and prohibit the government from opening a probate

case for Kenneth's estate. Citing *United States v. Summerlin*, 310 U.S. 414 (1940), the government responds that it is not bound by state statutes of limitations.

"It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights. The same rule applies whether the United States brings its suit in its own courts or in a state court." *Summerlin*, 310 U.S. at 416 (citation omitted). Accordingly, Minnesota's statute of limitations on fraudulent conveyance claims does not apply to the federal government, *United States v. Wurdemann*, 663 F.2d 50, 51 (8th Cir. 1981), and "Minnesota statutes limiting the time for creditors to file claims with the Probate Court have no application to the United States," *United States v. Luce*, 78 F. Supp. 241, 243 (D. Minn. 1948); *see In re Paulson's Estate*, 293 N.W. 607, 609 (Minn. 1940) ("In short, our statute is one of 'non-claim' denying to the probate court power to allow claims after the time stated. . . . It probably does not affect claims in favor of government, state or national."). The government's claims are not barred by state statutes of limitations.[6]

## C.     Fraudulent Conveyance

The government asks the Court to set aside the transfer of the Bigalk farm to K & K as a fraudulent conveyance.[7]  Whether a conveyance may be set aside as fraudulent must be determined in accordance with state law. *United States v. Scherping*, 187 F.3d 796, 804 (8th Cir.

---

[6]     The Responding Defendants also contend that the government has not shown that its tax lien filings against Kenneth, Kathryn, and K & K were timely or legally effective. "Bar by a statute of limitations is typically an affirmative defense, which the defendant must plead and prove." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008). The Responding Defendants, however, identify no evidence in support of their contention, and the Court declines to consider it at this time.

[7]     The Responding Defendants contend that Minnesota law prohibits a court from setting aside a conveyance of homestead exempt property as fraudulent. The Eighth Circuit rejected this argument in *United States v. Bierbrauer*, 936 F.2d 373, 375 (8th Cir. 1991) (stating that "federal law is superior to Minnesota's homestead law" and that a fraudulent conveyance of homestead property "may be disregarded to satisfy the United States' tax lien, even if it could not be set aside by other creditors").

1999).  Under Minnesota law, the creditor bears the initial burden of proving fraud.  *Id.*  If the creditor demonstrates sufficient badges of fraud, the burden of production shifts to the party contending that a fraudulent conveyance has not occurred.  *Id.*  Minnesota Statutes § 513.44(a) (2008) provides:

> (a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)  with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (i)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (ii)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

**1.      Minn. Stat. § 513.44(a)(2)(ii)**

The parties do not dispute that the transfer of the Bigalk farm to K & K was made for no consideration other than capital units in K & K.  No evidence indicates that these capital units have any value.  Consequently, the evidence is undisputed that Kenneth and Kathryn transferred the Bigalk farm without receiving reasonably equivalent value in exchange.

The government contends that there is no genuine issue of material fact as to whether Kenneth and Kathryn transferred the Bigalk farm at a time when they believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due because Kenneth and Kathryn transferred the Bigalk farm to K & K in August 1991, shortly after

incurring a tax liability of $195,426 for 1990 and shortly before incurring tax liabilities of $321,531, $282,873, and $321,735 for 1991, 1992, and 1993, respectively.  The Responding Defendants maintain that a fact issue remains as to whether they were liable for those amounts.

Kenneth and Kathryn's liability to the government for taxes arose on the date each return was due to be filed and the taxes were required to be paid.  *Scherping*, 187 F.3d at 805.  As evidence of Kenneth and Kathryn's liabilities, the government submitted certificates of assessments indicating that substitute returns were prepared for Kenneth and Kathryn and that, based on those substitute returns, Kenneth and Kathryn owed the amounts stated above.  "When a taxpayer fails to file a return and refuses to disclose relevant information to the IRS, the Internal Revenue Code authorizes the agency to make and execute a substitute return for the taxpayer which 'shall be prima facie good and sufficient for all legal purposes.'"  *United States v. Silkman*, 220 F.3d 935, 937 (8th Cir. 2000) (quoting 26 U.S.C. § 6020(b)(2) (2006)).  "One 'legal purpose' is to assess the tax liability reflected on the substitute return."  *Id.*; *see* 26 U.S.C. § 6201(a)(1) (2006).  When the IRS prepares a substitute return and assesses the taxpayer for the deficiencies shown on those substitute returns, and the taxpayer does not timely challenge the assessed deficiencies by administrative appeal or civil deficiency or refund litigation, the assessment becomes administratively final and is prima facie evidence of the asserted tax deficiency.  *See Silkman*, 220 F.3d at 937 ("[A]n unchallenged certificate of assessment is prima facie evidence of a deficiency when a taxpayer who filed no return is charged with tax evasion.").  Here, no evidence indicates that Kenneth and Kathryn timely challenged the assessed deficiencies; the certificates of assessment are prima facie evidence of their tax liabilities.

The Responding Defendants offer Kenneth and Kathryn's tax returns for tax years 1990, 1991, 1992, and 1993, which indicate tax liabilities of $178, $0, $968, and $6,493, respectively,

as evidence that Kenneth and Kathryn did not owe the amounts stated on the certificates of assessments.  Those tax returns, offered to prove the amount of tax owed by Kenneth and Kathryn, are inadmissible hearsay that the Responding Defendants cannot use to avoid summary judgment.  *See* Fed. R. Evid. 801(c); Fed. R. Civ. P. 56(e).  Moreover, "it is axiomatic that neither tax returns themselves, nor the execution of such forms under penalty of perjury, establishes the truth of items recited therein."  *Megibow v. C.I.R.*, T.C. Memo. 2004-41, 87 T.C.M. (CCH) 987, 2004 WL 309153, at *12 (Feb. 19, 2004); *see also Lawinger v. Comm'r*, 103 T.C. 428, 438, 1994 WL 471849 (1994) ("Tax returns do not establish the truth of the facts stated therein.").  The tax returns cannot rebut the government's evidence of Kenneth and Kathryn's tax liability.

The Responding Defendants did not submit any other records, receipts, or statements establishing the deductions to which Kenneth and Kathryn may have been entitled.  *See* 26 U.S.C. § 6001 (2006) (requiring persons liable for taxes to "keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax under this title").  The Responding Defendants contend that no such records are available because Kenneth destroyed them at the recommendation of Special Agent Tschida.  However, counsel for the government states in a declaration that he produced to the Responding Defendants in December 2008 and January 2009 all cancelled checks the IRS had summonsed from Kenneth and Kathryn's feed supplier, as well as receipts, cancelled checks, bank records, and other items relating to the IRS's audits of Kenneth and Kathryn for 1990 to 1993.  The Responding Defendants have not submitted these documents or any other evidence establishing Kenneth and Kathryn's expenses to the Court.  Consequently, there is no genuine issue of material fact as to Kenneth and Kathryn's tax liability for 1990 to 1993.

The government contends that Kenneth and Kathryn believed or reasonably should have believed that their tax debts were beyond their ability to pay as they became due because they transferred the Bigalk farm, which was their principal asset, to K & K in 1991. In addition, Kenneth stated during his trial testimony that he submitted the false money order to the IRS because "when you're desperate, you try about anything," while Kathryn's affidavit states that she and Kenneth were "as poor as most farmers" from the late 1980s to the mid-1990s and that they did not have much money. The Responding Defendants identify no evidence showing that Kenneth and Kathryn were able to pay their tax debts for 1990 to 1993. The Court concludes that there is no issue of fact as to this issue.

The Responding Defendants have not shown a genuine issue of material fact as to whether Kenneth and Kathryn received "a reasonably equivalent value" when they transferred the Bigalk farm to K & K or whether Kenneth and Kathryn believed or reasonably should have believed that they would incur tax liabilities beyond their ability to pay as they became due. Accordingly, the Court determines that the transfer of the Bigalk farm to K & K was a fraudulent transfer under Minn. Stat. § 513.44(a)(2)(ii), and grants the government's motion for summary judgment on this claim.

## 2. Minn. Stat. § 513.44(a)(1)

The government also contends that the transfer was fraudulent under Minn. Stat. § 513.44(a)(1) because Kenneth and Kathryn made the transfer with actual intent to hinder, delay, or defraud the government. Actual intent may not be presumed, but may be established through the examination of circumstantial evidence or "badges of fraud." *Scherping*, 187 F.3d at 804 (applying Minn. Stat. §§ 513.20-.32, which were repealed in 1986 and replaced in part with Minn. Stat. § 513.44). Relevant factors for consideration when determining actual intent under

Minn. Stat. § 513.44(a)(1) include whether the transfer was to an insider, whether the debtor retained possession or control of the property transferred after the transfer, whether the transfer was of substantially all of the debtor's assets, whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred, whether the debtor was insolvent or became insolvent shortly after the transfer was made, and whether the transfer occurred shortly before or shortly after a substantial debt was incurred. Minn. Stat. § 513.44(b). The Court may consider other relevant factors when determining whether a transfer is fraudulent. *See Scherping*, 187 F.3d at 804.

The undisputed evidence shows that the trustees and officers of K & K were all related to or friends of Kenneth and Kathryn and that Kenneth "ran the business" and made the decisions relating to the Bigalk farm. Consequently, there is no issue of fact as to whether the transfer of the Bigalk farm to K & K, which was controlled by Kenneth, was a transfer to an insider. The evidence further establishes that Kenneth and Kathryn retained possession and control of the Bigalk farm after its transfer to K & K, that Kenneth and Kathryn did not receive reasonably equivalent consideration in exchange for the Bigalk farm, and that the Bigalk farm constituted Kenneth and Kathryn's principal asset and sole source of income. Moreover, Kenneth and Kathryn transferred the farm to K & K shortly before they incurred substantial debt in the form of their tax liabilities for 1991 to 1993 and shortly after incurring substantial debt in the form of their tax liability for 1990. Although Kathryn denied in her affidavit that she and Kenneth were insolvent, there is no evidence that they were able to pay their tax debts as they came due, and the Responding Defendants have not identified any assets other than the Bigalk farm held by Kenneth and Kathryn. Consequently, the evidence establishes that Kenneth and Kathryn were insolvent or became insolvent shortly after transferring the Bigalk farm to K & K. *See* Black's

Law Dictionary 812 (8th ed. 2004) (defining "insolvent" as "having liabilities that exceed the value of assets").

Finally, Kenneth's involvement in the tax protestor movement, Kenneth and Kathryn's failure to file tax returns for 1991 to 1993, their attempts to avoid paying tax by sending tax protestor rhetoric to the IRS between 1993 and 1995, and Kenneth's conviction for conspiracy to defraud the United States support the conclusion that the transfer of the Bigalk farm to K & K was fraudulent. *See id.* at 805 (holding that taxpayers' deliberate efforts to evade tax and conviction of conspiracy for tax evasion supported conclusion that transfer was fraudulent under Minnesota law). The Court concludes that there is no genuine issue of material fact as to whether the conveyance of the Bigalk farm was fraudulent under Minn. Stat. § 513.44(a)(1), and grants summary judgment in favor of the government.

**D.    Alter Ego or Nominee**

The government also seeks a declaration that K & K is the alter ego or nominee of Kenneth and Kathryn. The government may collect the tax debts of a taxpayer from assets of the taxpayer's alter ego.[8] *Scherping*, 187 F.3d at 801. Federal courts look to state law when determining whether an entity is the alter ego of a taxpayer. *Id.* Minnesota courts employ a two-prong test when making this determination. *White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn. 1982). First, the court considers the relationship between the individual and the entity, focusing on factors including the failure to observe corporate formalities, siphoning of funds by the individual, the nonfunctioning of other officers and directors, the absence of corporate records, and the existence of the corporation as merely a facade for individual dealings. *Id.* Second, the court examines the relationship between the entity and the party seeking to disregard the entity.

---

[8]    The parties do not distinguish between an alter ego and a nominee. The Court therefore treats any such distinction as irrelevant.

*Id.* Satisfaction of this prong "requires the showing of 'an element of injustice or fundamental unfairness,'" which can be made through evidence that the entity has been operated as a constructive fraud or in an unjust manner. *See id.* (quoting *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979)).

In *Scherping*, the Eighth Circuit affirmed the district court's grant of summary judgment that certain trusts were the alter egos of taxpayers under Minnesota law where the taxpayers and their family members were either trustees or held all of the beneficial interests in the trusts, the taxpayers received no compensation for the transfer of real property to the trusts other than shares in the trusts, the taxpayers continued to farm the property after the transfer, one of the taxpayers and his wife lived on the property after the transfer, and the trusts held no other assets and failed to maintain separate checking accounts. 187 F.3d at 802-03. Virtually all of these factors are present here. Kenneth and Kathryn held all of the beneficial interest in K & K when the Bigalk farm was transferred, received no compensation for the transfer other than capital units of K & K, and continued to live on and work the Bigalk farm after the transfer without restrictions. Kenneth controlled K & K, while Kim, Terry, and Todd did very little (other than sign documents at Kenneth's request) as trustees or officers of K & K. The absence of evidence showing that the board of K & K held regular meetings in the 1990s, Kenneth and Kathryn's use of K & K's checking account for their personal expenses, and the fact that the insurance for the Bigalk farm listed Kenneth and Kathryn as beneficiaries indicates that K & K did not observe "trust formalities." Finally, Kenneth and Kathryn listed the Bigalk farm as a personal asset during their 1998 bankruptcy. The Responding Defendants identify no evidence to dispute the presence of these factors. The Court therefore concludes that there is no genuine issue of material fact as to whether K & K was a facade for Kenneth and Kathryn's individual dealings.

With respect to the second step, the government submitted evidence that Kenneth became involved with the tax protestor movement in the 1980s, that Kenneth believed he did not have to pay taxes, that Kenneth and Kathryn sent tax protestor rhetoric to the IRS between 1993 and 1995, and that the farm was transferred to K & K to avoid paying taxes on it and to protect it from the government.  This evidence shows that K & K was operated in an unjust manner towards the government.  Kenneth's conviction for conspiracy to defraud the United States by submitting a false money order to pay his tax liabilities and the purchase of K & K from Cache Properties Unlimited and Yung further supports this conclusion.  The Responding Defendants contend that Kenneth played only a minor role in the conspiracy and seek to distinguish K & K from the trusts promoted and operated by Yung because Kenneth and Kathryn did not "pattern[] their usage" of K & K on the scheme delineated in *United States v. Scott*, 37 F.3d 1564 (10th Cir. 1994).  Nevertheless, the Court finds that Kenneth and Kathryn's tax protestor activities, Kenneth's conviction, and the purchase of a Cache Properties Unlimited trust establishes that K & K is the alter ego of Kenneth and Kathryn.  *Cf. Scherping*, 187 F.3d at 802-03 (finding that taxpayers' criminal convictions for conspiring to evade the payment of federal income taxes and the fact that the trustees were entities "repeatedly recognized as vehicles for the promotion of abusive tax shelters" supported conclusion that trusts were sham entities created to evade payment of federal tax).  Accordingly, there is no genuine issue of material fact as to whether K & K was operated in an unjust manner towards the government.[9]

_____

[9]     Making what appears to be an estoppel argument, the Responding Defendants contend that the government is barred from asserting that K & K is the alter ego of Kenneth and Kathryn. The Responding Defendants base this argument on the government's "validation" of K & K as a legitimate trust when the IRS determined that K & K was a grantor trust whose income and expenses would be itemized on Kenneth and Kathryn's personal income tax returns and the USDA's description of K & K as "properly chartered having two members" in its letter dated May 13, 1992.  To establish a claim of equitable estoppel against the government, the

Citing *Roepke v. Western National Mutual Insurance Co.*, 302 N.W.2d 350 (Minn. 1981), and *Cargill, Inc. v. Hedge*, 375 N.W.2d 477 (Minn. 1985), the Responding Defendants contend that the government should not be permitted to "reverse pierce" the corporate veil to reach K & K's corporate assets because there is no basis in Minnesota law suggesting that the Minnesota Supreme Court would recognize a reverse pierce on behalf of a creditor. "[R]everse piercing is a well-established theory in the federal tax realm." *Scherping*, 187 F.3d at 803. In *Scherping*, the Eighth Circuit found that a reverse pierce was consistent with *Roepke* and *Cargill* where the trusts at issue were the alter egos of the taxpayers, there were strong policy reasons for reverse piercing the corporate veil to avoid fraud and collect delinquent federal taxes, and there was a strong degree of identity between the "guilty" individuals and the entities to be disregarded. 187 F.3d at 803-04.

The Responding Defendants contend, however, that there is not a strong degree of identity here because Kenneth is deceased and Kathryn no longer works on the Bigalk farm. They also contend that reverse piercing is impermissible because it would hurt Kim, Terry, and Todd, who now hold all the beneficial interests in K & K, and would particularly hurt Todd because he has lived on and worked the Bigalk farm for several years. Given the facts of this case, the Court declines to permit changes in the beneficial ownership of K & K that occurred after Kenneth and Kathryn used K & K to avoid paying federal taxes to impair the government's ability to avoid fraud and collect delinquent taxes. *Cf. Cargill*, 375 N.W.2d at 479 ("[T]he degree of identity between the individual and his or her corporation, the extent to which the

---

Responding Defendants must prove: (1) a false representation by the government; (2) the government's intent to induce them to act on the misrepresentation; (3) their lack of knowledge or inability to obtain the true facts; (4) their detrimental reliance; and (5) affirmative misconduct by the government. *See Mejia-Perez v. Gonzales*, 490 F.3d 1011, 1012 (8th Cir. 2007). The Responding Defendants identify no evidence to support their argument, and the Court rejects it.

corporation is an alter ego, is important. Also important is whether others, such as a creditor or other shareholders, would be harmed by a pierce."). The Court concludes that a reverse pierce is permissible here.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.     United States of America's Motion for Partial Summary Judgment [Docket No. 49] is GRANTED.

2.     The transfer of the Bigalk farm to K & K Limited Trust is set aside as fraudulent.

3.     K & K Limited Trust holds the Bigalk farm as the alter ego or nominee of Kenneth and Kathryn Bigalk.

Dated:  August 28, 2009

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge